<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| Lloyd A. Massey, | : | |
| | : | Civil Action No. 11-7261(RMB) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| Charles Warren, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |

**BUMB**, District Judge

This matter is presently before the Court upon submission of an Amended Petition for a Writ of Habeas Corpus under Title 28 U.S.C. § 2254 ("Pet." Doc. No. 26), by Lloyd A. Massey ("Petitioner").  For the reasons stated below, the Petition will be denied.

I.  <u>BACKGROUND</u>

Petitioner is presently confined at New Jersey State Prison, in Trenton, New Jersey.  (Pet. at 1.)  On June 12, 2002, he was convicted by a jury in the Superior Court of New Jersey, Atlantic County, of purposeful and knowing murder of Richard White, Lamont Wilson and Michael Demps; attempted murder of Terrance Harris; possession of an assault firearm; possession of a large capacity magazine; hindering apprehension; and tampering

with evidence.   (Mem. of Law in Supp. of Amended Answer to Pet. for Writ of Habeas Corpus ("State's Mem.") Doc. No. 27-2 at 1). Petitioner was subsequently sentenced to three consecutive terms of life imprisonment without parole.  State v. Massey, 2007 WL 2301651, at *1 (N.J. Super. Ct. App. Div. Aug. 13, 2007).

Petitioner filed a direct appeal, and the appellate court made the following findings.

> A person identified as [Petitioner] fired an AK47 assault rifle into a car killing three occupants, and hitting a fourth, Terrance Harris, who was able to run away. The State's proofs included identification testimony and evidence that [Petitioner] had previously possessed an AK47, that all of the bullets came from the same AK47, and that [Petitioner] had a prior fight with a friend of the victims and a confrontation with one of the victims, Michael Demps, who had threatened [Petitioner] earlier on the morning of the 4 A.M. shootings. The passenger in [Petitioner's] vehicle at the time of the shootings, Gary Way, was a witness, as were passing motorists including Karen Simpkins, and Harris, the surviving passenger. Harris did not identify the shooter, and did not see Way with a gun.  A cellmate of [Petitioner's] also testified that [Petitioner] said he killed the victims because they "pissed him off."

> The [Petitioner] asserted that Way was the shooter, that Simpkins[,] who made a positive identification[,] did so after seeing his photo "at least five times in three different arrays," that the jail mate was not in the same location of the jail as [Petitioner], and that a Harrah's security officer believed he saw Way with a gun. [Petitioner] also endeavored to refute other evidence produced by the State. Part of the

2

> testimony developed by the defense was that
> the witnesses described Way as wearing baggy
> clothing, which could have concealed the
> murder weapon.
>
> The State rebutted the defense with proofs
> which included evidence that the long
> barreled gun could not have been hidden in
> Way's clothing, and that the shells found
> all came from the same gun.

Id.

A.   Remand to the trial court regarding the polygraph
     examination of Gary Way

In 2007, the appellate court remanded several issues for
further proceedings, including whether failure to disclose Gary
Way's polygraph testing and allow his cross examination on the
polygraph material required that a new trial be granted.
Massey, 2007 WL 2301651, at *2.  The defense characterized Way
as a critical witness of the State, whom the defense contended
was the actual perpetrator.  Id.

Way gave two statements to police during the investigation,
about a week apart.  Id.  He gave the second statement after
taking a polygraph test.  Id.  Way gave information in the
second statement that he had not given in the first statement,
that he saw the gun used in the shootings at Petitioner's house
before the day of the crime and that he saw the gun in the
backseat of Petitioner's car before the shooting began.  Id.
The defense argued it was prejudiced because it was not allowed

to "develop before the jury that Way changed his story after he failed a polygraph."  Id.

On March 27, 2008, after a hearing on remand, the trial court, Judge James E. Isman, made the following findings concerning whether defendant was prejudiced by exclusion of testimony about the polygraph examination:

> There were witnesses to this incident, not just Gary Way.  Gary Way is, only in the minds of the Defense and creation of the Defense, the key to the State's case.  He is merely a small piece of the puzzle.  He is a piece that could be removed from the puzzle and as the Prosecutor argued, you'd still have a pretty intact jigsaw puzzle of who the killer was and is.  And as a matter of fact, when it comes to Mr. Way, approximately ninety-nine percent of his testimony is corroborated by other people. So it's not as though it's just Gary Way saying something.  No.  It's Gary Way saying something that Karen Simpkins echoes, Mr. Simpkins echoes, Terrance Harris echoes, Hakeem Moley echoes, Steven Hassenpat echoes.  It's not just Gary Way and to mislead a reviewing Court into thinking that Way is the end all and be all of this case or even a critical part of this case is not accurate.  Is simply not accurate.
> . . .
> So you have an admission.  You have IDs and you have one of, if not the strongest set of circumstances evidence-wise that have ever been presented in front of me . . . On top of that, you have a little thing called flight . . .

Transcript, State of New Jersey v. Massey, A-1794-02-T4 (N.J. Super. Ct. March 27, 2008; ECF No. 15-13 at 25-27).

When the issue returned to the appellate court in 2010, the court held Petitioner was not prejudiced by the exclusion of testimony on the matter.  Massey, 2010 WL 3419186, at *6.  The court explained:

> We cannot disagree with the trial judge that the result would have been the same without Way's testimony and that there was no reasonable possibility that disclosure of the polygraph evidence would have affected the result. The only substantive difference in [Way's] second statement was the additional comments about seeing the gun before the shooting.

Id.  In finding harmless error, the court noted:

> [A]mong other evidence, Harris testified that he saw Way without a gun before the shooting began from the adjacent vehicle, and there was testimony Way exited the car before the shooting started and, according to Harris, that the shooting came from the driver's side of the vehicle. Karen Simpkins also identified [Petitioner] as the driver, and Steven Hassenpat, a cell mate of defendant at the Ocean County Jail, testified that [Petitioner] told him he killed the trio because "they pissed [me] off."

Id.

> B.   Remand to the trial court regarding late disclosure of AK-47 parts

The appellate court, in its 2007 decision, also addressed Petitioner's allegation of a discovery violation concerning AK-47 parts that were found approximately forty miles from where

5

the murders were committed, according to the trial court on

remand.   See ECF No. 15-13 at 22.   The appellate court stated:

> [D]uring his cross-examination the State's
> ballistics expert, State Police Detective
> James Storey, testified that he had been
> given parts of an AK-47 to test fire and
> compare with the shells found at the scene
> of the crime. This testimony came as a
> surprise to the defense. The expert report
> provided in discovery did not include
> reference to the finding of a gun. The trial
> judge denied a mistrial which was premised
> on the lack of a full report in discovery
> and failure to give defendant an opportunity
> to test the gun or its parts. The judge
> stated that the gun was found at a time and
> location too remote from the scene of the
> crime and believed the gun could not be
> tested.
>
> In response to a later request for a read
> back of Storey's testimony during
> deliberations, the judge told the jury that
> "there is no evidence or testimony in the
> record ... in this trial to suggest that
> those parts are in any way related to the
> assault firearm used on September 8th of
> 2000" and that the jury should draw no
> inference "against or in favor of either
> side from this portion of his testimony."
>
> Defendant contends that the jury should have
> been advised of when and where the parts
> were found, because defendant could not have
> taken [the gun parts to the place where they
> were found] before he [was] arrested, and
> only Way could have done so, which would
> have supported the defense that [Way] had to
> have possessed the AK-47 and shot the
> victims.
>
> [Petitioner] does not explain how testing by
> his expert could have helped the defense or
> what could be introduced to benefit
> [Petitioner's] case. In fact, his expert

>   retained the gun (which Storey could not
>   test fire) at the time of sentencing, and
>   apparently never came up with anything of
>   substance beneficial to the defense. . . .
>   Nevertheless, because there must be a
>   remand, the parties should update the record
>   on the issue so that it can be considered in
>   connection with the trial judge's
>   reconsideration of defendant's motion for a
>   new trial and our ultimate review of the
>   case which may require consideration of the
>   judge's instructions to the jury on the
>   subject and a harmless error analysis.

Id. at *11-12.

After the hearing on remand, the trial court found "there was nothing in the record to suggest that these gun parts that were found months later in an area that is accessible to Camden, Newark, Philly, New York, dozens of other - - dozens of other towns, had anything to do with the AK alleged to be used in this case." (ECF No. 15-13 at 23-24.)

In its 2010 decision, the appellate court denied Petitioner's claim regarding the late disclosure of the AK-47 parts. Massey, 2010 WL 3419186, at *6.  The court found there was no viable issue because "defendant has still been unable to develop anything exculpatory with respect to the AK47 . . . " Id.

C.   Appellate Court Decision on issues reserved from
     original appeal

In 2010, the appellate court addressed the issues it had reserved, pending the result of the remand proceedings, from the

original appeal.  Massey, 2010 WL 3419186, at *7-11.  The court

affirmed Petitioner's convictions.   Id.

> a.   Exclusion of expert testimony on unreliability of
> eyewitness identifications.

As background, the trial court held a pre-trial hearing on

the State's motion to preclude the defense from calling Dr.

Steven Penrod as an expert on the issue of the reliability of

eyewitness identification.  (ECF No. 11-1 at 4-9.)  The State

argued the subject matter was inappropriate for expert testimony

under New Jersey Evidence Rule 702 and New Jersey Supreme Court

precedent because the subject matter was not beyond the ken of

the average juror.  (Id.)  The trial court excluded the

testimony, relying on New Jersey Rule of Evidence 702, which was

"adopted from the Federal rule":

> If scientific, technical or other
> specialized knowledge will assist the trier
> of fact to understand the evidence or
> determine a fact in issue, a witness
> qualified as an expert by knowledge, skill,
> experience or training or education, may
> testify thereto in the form of an opinion or
> otherwise.

(ECF No. 11-1 at 22-23, 28.)

The New Jersey Supreme Court interpreted Rule 702 to

require the following prior to admission of expert testimony:

(1) the subject matter of the testimony must be beyond the ken

of the average juror; (2) the expert testimony must be

sufficiently reliable; and (3) the witness must have sufficient

8

expertise to offer the intended testimony. (Id. at 23.) The trial court also discussed the New Jersey Supreme Court case State v. Cromedy, 158 N.J. 112 (1999), which concluded it was appropriate to give a "cross racial" instruction to the jury, but that expert testimony on eyewitness identification would not assist the fact-finder and was not beyond the ken of the average juror. (Id. at 24.)

The trial court determined that the defense failed to establish the first prong of admissibility under New Jersey precedent, that Dr. Penrod's testimony was on a subject beyond the ken of the average juror. (Id. at 25-26.) Thus, the court concluded Dr. Penrod's testimony would impede on the jury's province of determining the credibility of witnesses. (Id.) Furthermore, Dr. Penrod's testimony regarding unreliability of cross racial identification would not assist the jury because "it's clearly addressed in the model jury charge as promulgated . . . in response to the Cromedy decision." (Id. at 26.)

The appellate court summarily rejected Petitioner's claims regarding expert identification testimony but also suggested that Petitioner could raise additional claims in a post-conviction proceeding, based on a pending New Jersey Supreme Court decision on the issue. Massey, 2010 WL 3419186, at *7.

The appellate court also found that any error was harmless, describing the following evidence against Petitioner: (1) shots

were fired from a car identified as one owned by defendant's mother and considered by defendant's friends to be his; (2) there was confirming evidence that Way was with his girlfriend at the time of the altercation in the parking lot of the bar; (3) witness Hakim testified as to defendant's threats at that time about owning a gun that "spits rapid"; (4) Steven Hassenpat, a cellmate of Petitioner while at the Ocean County Jail, testified that Petitioner said he killed the trio because they "pissed [him] off"; and (5) Petitioner took flight to Georgia where he was arrested, suggesting consciousness of guilt. Id. at *7.

> b. Prosecutorial misconduct

The last issue addressed by the appellate court, relevant here, is whether the prosecutor's summation was unduly prejudicial. Id. at *11. The court concluded any overreaching by the prosecutor in defending police conduct "could not have affected the result." Id.

Petitioner appealed to the New Jersey Supreme Court, and it denied certification on January 20, 2011. (Pet., ¶ 9(g)). Petitioner did not seek post-conviction relief. (Pet., ¶10.)

> D. The Petition for Writ of Habeas Corpus, Answer and Reply

In the instant petition, Petitioner raised the following grounds for relief: (1) Petitioner was denied his Sixth and

10

Fourteenth Amendment right to present a defense when the trial court precluded expert testimony on eyewitness identification; (2) Petitioner was denied his Fourteenth Amendment right to due process because the prosecution failed to reveal evidence of the potential murder weapon until the middle of trial; (3) Petitioner was denied his Sixth Amendment right to confrontation when the trial court precluded cross-examination regarding a failed polygraph test; and (4) Petitioner was denied his Fourteenth Amendment right to due process when the prosecutor, in summation, stated that defense counsel made scurrilous and irrelevant attacks on the police officers to distract the jury from the real issues.  (Pet., ¶12.)

The State filed an Amended Answer ("Answer") and Memorandum of Law in Support of Amended Answer to Petition for Writ of Habeas Corpus ("State's Mem.")  (Answer, Doc. No. 27, State's Mem. Doc. No. 27-2.)  Respondents asserted an affirmative defense in their Answer, that three of Petitioner's four grounds for relief, Grounds 1, 3, and 4, were state court decisions based on state law that are not reviewable under 28 U.S.C. § 2254(a).  (Answer at 10.)  Respondents, however, also addressed the merits of each of Petitioner's claims.  Petitioner filed a reply.  (Petitioner's Supplemental Reply to Respondent's Amended Answer ("Petr's Reply"), Doc. No. 28.)

II.   <u>ANALYSIS</u>

    A.   <u>Standard of Review</u>

    28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus
> on behalf of a person in custody pursuant to
> the judgment of a State court shall not be
> granted with respect to any claim that was
> adjudicated on the merits in State court
> proceedings unless the adjudication of the
> claim--
>> (1) resulted in a decision that was
>> contrary to, or involved an
>> unreasonable application of, clearly
>> established Federal law, as determined
>> by the Supreme Court of the United
>> States; or
>> (2) resulted in a decision that was
>> based on an unreasonable determination
>> of the facts in light of the evidence
>> presented in the State court
>> proceeding.

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the Supreme Court.  <u>Eley v. Erickson</u>, 712 F.3d 837, 846 (3d Cir. 2013)(citing <u>Williams v. Taylor</u>, 529 U.S. 362, 405 (2000)).  The phrase "clearly established Federal law" "refers to the holdings, not the dicta" of the U.S. Supreme Court's decisions.  <u>Williams</u>, 529 U.S. at 412.

An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. Eley, 712 F.3d at 846 (quoting Renico v. Lett, 130 S.Ct. 1855, 1862 (2010)). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 562 U.S. 86, 99 (2011). Thus, when a state court summarily denies a claim "a habeas court must determine what arguments or theories ... could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Cullen v. Pinholster, 131 S.Ct. 1388, 1402 (2011)(quoting Harrington, 562 U.S. at 100 (emphasis added).

        B.   State Law Grounds

Respondents contend a habeas court cannot address claims that solely involve application of state law.  (Answer at 8.) While this is a true statement, it is not pertinent here.  On direct appeal and in his habeas petition, Petitioner challenged the state court rulings, including Grounds One, Three and Four of the Petition, as violations of his federal constitutional

13

rights, and it is undisputed that Petitioner exhausted these federal claims in state court. See, Massey, 2010 WL 3419186, at *2-3. Therefore, this Court may address Petitioner's constitutional claims under 28 U.S.C. § 2254. See Porter v. Horn, 276 F.Supp.2d 278, 362 (E.D. Pa. 2003)(exhausted federal claims were available for federal habeas review).

     C.   Merits of the Habeas Claims

        1.  Ground One

In Ground One of the Petition, Petitioner argued he was denied his Sixth and Fourteenth Amendment Rights to present a defense when the trial court precluded expert testimony on eyewitness identifications. Petitioner asserted that identification was a crucial issue in his case, and the trial court arbitrarily excluded expert testimony. (Petr's Mem. at 23-29.)

Respondents argued that the rights to confrontation or compulsory process are only violated when state rules infringe upon "a weighty interest of the accused" and are "arbitrary" or "disproportionate to the purposes they are designed to serve." (Id. at 22-23)(citing Holmes v. South Carolina, 547 U.S. 319, 319-20 (2006)(quoting United States v. Scheffer, 523 U.S. 303, 308 (1998)). Respondents concluded the state court ruling on admissibility of expert testimony, which relied on a well-

established local rule of evidence, was not arbitrary or disproportionate.  (Id. at 29.)

In Reply, Petitioner asserted there was only one witness who testified that Petitioner was the shooter, and there were serious problems with her identification.  (Petr's Reply at 6.) Petitioner argued the appropriate standard for addressing his claim is whether the proffered defense evidence was "weighty: not whether it would have negated all of the prosecution's evidence."  (Id. at 8)(citing Holmes, 547 U.S. at 328-31.)

The test described by the Supreme Court in Holmes v. South Carolina, 547 U.S. 319 (2006) governs Petitioner's habeas claim that his Sixth Amendment right to present a defense was violated by the trial court's exclusion of expert testimony on the unreliability of eyewitness identifications.  The Court explained the constitutional standard:

> "Whether rooted directly in the Due Process
> Clause of the Fourteenth Amendment or in the
> Compulsory Process or Confrontation Clauses
> of the Sixth Amendment, the Constitution
> guarantees criminal defendants 'a meaningful
> opportunity to present a complete defense.'
> " Crane [v. Kentucky, 476 U.S. 683] 690, 106
> S.Ct. 2142 (quoting California v. Trombetta,
> 467 U.S. 479, 485, 104 S.Ct. 2528, 81
> L.Ed.2d 413 (1984); (citations omitted).
> This right is abridged by evidence rules
> that "infring[e] upon a weighty interest of
> the accused" and are " 'arbitrary' or
> 'disproportionate to the purposes they are
> designed to serve.' " [United States v.]
> Scheffer, [523 U.S. 303] at 308, 118 S.Ct.
> 1261 [1998](quoting Rock v. Arkansas, 483

15

U.S. 44, 58, 56, 107 S.Ct. 2704, 97 L.Ed.2d
37 (1987)).

Holmes, 547 U.S. at 324-25.

Although Petitioner raised a federal constitutional claim in the state courts, the state court determinations were based on state law.  Under such circumstances, the role of the habeas court is to "determine what arguments or theories ... could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.  Harrington, 562 U.S. at 100.

There is little doubt that Petitioner had a "weighty interest" in reliable eyewitness identification of the shooter, given he was faced with the death penalty at trial.  The question then, is whether there is no reasonable basis for the state court's decision on this claim, according to fairminded jurists, that was consistent with the Supreme Court's holding in Holmes.

In Holmes, the Court reviewed cases in which it found state court rules were "arbitrary," defined as "rules that excluded important defense evidence but that did not serve any legitimate interests."  Holmes, 547 U.S. at 325.  One such rule was a state statute that "barred a person who had been charged as a participant in a crime from testifying in defense of another

16

alleged participant unless the witness had been acquitted." Id. (citing Washington v. Texas, 388 U.S. 14 (1967)).  Hence, the defendant was precluded from calling as a witness a person who had been charged and convicted of committing the same murder the defendant was charged with.  (Id.)

Another "arbitrary" rule barred parties from impeaching their own witnesses, and was applied in a case that prevented the defendant from impeaching a witness who had confessed to the murder at issue, but then recanted his confession on the stand. Id. (citing Chambers v. Mississippi, 410 U.S. 284, 294 (1973)). The Supreme Court also found a state rule "arbitrary" because it prevented a defendant from attempting to show his confession was unreliable based on the circumstances under which it was made. Id. (citing Crane v. Kentucky 476 U.S. 683, 691 (1986)).

Finally, a rule prohibiting hypnotically refreshed testimony was unconstitutional because it was an arbitrary restriction on the right to testify absent clear evidence "repudiating the validity of all post-hypnosis recollections." Id. (citing Rock v. Arkansas, 483 U.S. 44, 61 (1987)).  In contrast, a rule excluding all polygraph evidence did not abridge the right to present a defense.  Id. (citing United States v. Scheffer, 523 U.S. 303, 309 (1998)).  The interest served by the exclusionary rule in Scheffer was insuring that

only reliable evidence was presented to a trier of fact in a criminal trial.  523 U.S. at 310-11.

Here, the trial court excluded expert testimony on eyewitness identification because the defense failed to establish that Dr. Penrod's testimony was on a subject beyond the ken of the average juror.  (ECF No. 11-1 at 25-26.)  The purpose of excluding such evidence was that it impeded on the jury's province of determining the credibility of witnesses. (Id.)  "Determining the weight and credibility of witness testimony . . . has long been held to be the "part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge . . . "  Scheffer, 523 U.S. at 313 (quoting Aetna Life Ins. Co. v. Ward, 140 U.S. 76, 88, 11 S.Ct. 720, 724-725, 35 L.Ed. 371 (1891)).

Here, the trial court's ruling did not deprive the defense of the opportunity to test the reliability of the eyewitness testimony on cross-examination, the court determined only that the jury was capable of addressing the reliability of the testimony without the need for an expert.  Although jurors might have less knowledge of issues concerning cross racial identification than of other issues affecting eyewitness identification, the trial court determined this would be addressed by the jury instruction it was required to give under

18

state law,[1] thus, precluding the need for an expert to testify on
the issue.  This case is not like the exceptional cases
described in Holmes, where the Supreme Court found that
application of a state rule precluding certain testimony
violated a defendant's right to present a defense.

For this reason, fair-minded jurists could disagree on
whether New Jersey Court Rule 702, as applied by the state trial
court here, was arbitrary, and if the rule was proportionate and
served a legitimate interest of preserving the jury's role in
determining the credibility of witnesses.  Therefore, under the
habeas standard of review, the state court decision did not
involve an unreasonable application of Holmes.  Ground One of
the Petition will be denied.

    2.   Ground Two

In support of Ground Two of the Petition, Petitioner argued
he was denied his Fourteenth Amendment right to due process
because the prosecution failed to reveal evidence of parts of an
AK-47 that were found and sent to the prosecutor before trial.

_____

[1] In Cromedy, the New Jersey Supreme Court requested that the
Criminal Practice and Model Jury Committees develop a cross-
racial jury instruction in accordance with the Court's opinion,
and held that a cross-racial instruction "should be given only
when . . . identification is a critical issue in the case, and
an eyewitness's cross-racial identification is not corroborated
by other evidence giving it independent reliability."  151 N.J.
112, 132 (1999)(abrogated by State v. Henderson 208 N.J. 208
(2011)(holding a jury instruction on cross-racial identification
should be given whenever cross-racial identification is in issue
at trial).

(Petr's Mem. at 35.)   Petitioner asserted the appellate court's decision involved an unreasonable application of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and its progeny.  (<u>Id.</u> at 39.)  He contended that undisclosed evidence need not be exculpatory to constitute a <u>Brady</u> violation, the issue is whether evidence was favorable to the accused.  (Petr's Mem. at 36.)  Thus, Petitioner stated the appropriate standard for review is "whether favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  <u>Id.</u> at 37 (quoting <u>Kyles v. Whitley</u>, 514 U.S. at 435.)

Petitioner contended the gun parts were favorable even if they could not be conclusively tied to the crime because a crucial issue was whether the AK-47 was small enough that Gary Way could have hidden it in his baggy pants.  (<u>Id.</u> at 37-38.) Petitioner explained:

> If defense counsel had prior notice of the existence of the gun parts, they could have had Det. Storey, a State Police officer, testify that he had examined a cut-up AK-47 in connection with this case, and that it was only 18 ½ inches long with the stock folded.  That testimony would have completely demolished the State's theory that the murder weapon was too long for Gary Way to have hidden it in his pants as Tara Mays and Dudley Johnson told the police.

20

(Id. at 38-39.)  Petitioner asserted that because there was no physical evidence connecting him to the crime, and the only eyewitness identification was questionable, the undisclosed evidence about the AK-47 was enough to undermine the confidence in the outcome of the trial.  (Id. at 40.)

Respondents argued there was no error because evidence of the discarded AK-47 was not material, not favorable to the accused, and not exculpatory.  (State's Mem. at 29.) Respondents asserted that as soon as the State became aware of the existence of the AK-47 parts, full disclosure was made, weeks before the defense rested its case.  (Id. at 31.)  The defense could have offered evidence that pieces of the AK-47 were found, and could have made any arguments supported by such evidence.  (Id. at 33.)  Respondents argued the trial court was correct in ruling that "it was entirely possible for the defense itself to have offered evidence that the pieces of the AK-47 were found and make the arguments that the petitioner now claims it would have."  (Id. at 33, citing ECF No. 14-8 at 17-22.)

Respondents also pointed to Judge Isman's finding that there "was nothing in the record to suggest that these gun parts [] had anything to do with the AK47 alleged to be used in this case," and the gun parts differed physically from the alleged murder weapon.  (State's Mem. at 32, citing ECF No. 15-11 at 13-14.)  Respondents further asserted that the Petitioner's

arguments regarding the gun do not "nearly approach the level of undermining confidence in the outcome of the verdict, as in Brady, Bagley,[2] and Youngblood."[3]  (Id. at 33-34.)

The state appellate court found no Brady violation because there was nothing exculpatory about the AK-47.  Massey, 2010 WL 3419186, at *6.  Even if the court was wrong to consider whether the evidence was "exculpatory" instead of "favorable to the accused," the evidence in the state court record did not establish that the gun parts were favorable to the accused in any meaningful way.  First, there was virtually no evidence supporting a conclusion that the gun parts found were from the same gun used in the crime.  Second, Petitioner was not precluded from presenting his argument that Gary Way could have hidden an AK-47 in his baggy clothing, explaining why witnesses at the scene did not see him with a gun.

Assuming the AK-47 parts were favorable to Petitioner, his inability to use this evidence does not undermine confidence in the verdict.  There was plenty of evidence supporting the jury's conclusion that Petitioner was the shooter, including an

---

[2] In U.S. v. Bagley, the Supreme Court held that impeachment evidence is evidence favorable to the accused, and falls within the Brady rule for disclosure.  473 U.S. 667, 676 (1985).
[3] In Arizona v. Youngblood, the Supreme Court held that, unlike Brady, the good or bad faith of the State is relevant where the issue is the failure of the State to preserve evidentiary material that could have been subjected to tests, the results of which might have exonerated the defendant.  488 U.S. 51, 57 (1988).

uninterested eyewitness's identification of Petitioner.  <u>Massey</u>,
2010 WL 3419186, at *2.  There was much corroborating evidence
to the identification, including testimony from the victim who
survived, excluding Way as the shooter because Way exited the
car without a gun before the shooting started; testimony from an
eyewitness that the shooter drove away from the scene, in
combination with testimony that Way ran away from the scene on
foot; and testimony that Petitioner told a cellmate he killed
three people because they "pissed him off."  <u>Massey</u>, 2010 WL
3419186, at *2.  For these reasons, Ground Two of the Petition
will be denied because the state court decision did not involve
an unreasonable application of <u>Brady</u> and its progeny.

        3.  <u>Ground Three</u>

    In Ground Three of the Petition, Petitioner alleged the
trial court violated his constitutional right to confrontation
by precluding cross-examination of witness Gary Way regarding
his polygraph testing.  (Petr's Mem. at 40-41.)  Way failed the
polygraph exam on the question of whether he shot any of the
victims.  (<u>Id.</u> at 40.)  At trial, Way admitted the police called
him in for further questioning because his first statement did
not appear to be the truth.  (<u>Id.</u> at 41.)

    Petitioner further argued he should have been allowed to
cross-examine Way about his statement to police after his
polygraph test, that he was emotional while being tested because

he was present during the murders and felt partly responsible
for what happened.  (Id. at 41-42.)  Respondents asserted that
inability to cross-examine Way was not prejudicial because his
statements did not directly contradict his trial testimony.
(State's Mem. at 37.)  Moreover, Respondents contended the
inability to cross-examine with this information did not have a
substantial and injurious effect on the verdict, in light of the
evidence against Petitioner.  (State's Mem. at 38.)

In conducting habeas review under 28 U.S.C. § 2254, a
federal court must assess the prejudicial impact of the
unconstitutional exclusion of evidence for harmless error, and
error is harmless unless it "had substantial and injurious
effect or influence in determining the jury's verdict." Fry v.
Pliler, 551 U.S. 112, 120-21 (2007).  This Court cannot conclude
that excluding cross-examination of Way regarding his polygraph
testing had a substantial and injurious influence on the jury's
verdict.

Even if the jury had heard that Way failed the polygraph
examination, he explained that he was nervous during the
polygraph because he felt partly responsible for what happened.
He was present during the murders.  However, it is not likely
the jury would have believed Way was the shooter because he did
not have a motive.  Petitioner's motive, however, was well-
established at trial, Petitioner fled the state after the crime,

and a cellmate testified Petitioner told him that he killed three people who "pissed him off."  For this reason, the Court will deny Ground Three of the petition.

     4.   Ground Four

In Ground Four of the Petition, Petitioner alleged that prosecutorial misconduct in summation denied his right to a fair trial.  The prosecutor told the jury in summation that defense counsel attacked the police officers who investigated the case with "scurrilous and irrelevant criticism."  (Petr's Mem. at 45)(citing ECF No. 14-4 at 24.)  The prosecutor suggested defense counsel's accusations against the police:

> [w]ere argued in the cynical belief that it
> would distract you from your principle role
> of reviewing the evidence of guilt, and the
> cynical belief that you would somehow be
> distracted that your perhaps level of
> discomfort with which the manner in which
> the case was investigated would somehow rub
> off in favor of the Defense's argument that
> there is reasonable doubt.

(Id. at 45-46.)

According to Petitioner, the prosecutor's statements were an attempt to divert the jury from focusing on a defense witness's statement to the police.  (Id. at 47-48.)  The defense argued the witness only told the police what they wanted to hear, recanting her testimony that Way had a gun so they would not send her to Florida on a warrant.  (Id. at 47)(citing ECF No. 14-4 at 28.)  Defense counsel played the witness's taped

25

statement to the jury to demonstrate she told the truth when she said Gary Way had an AK-47, and she felt a gun in his pants. (Id. at 46)(citing ECF. No. 13-3, at 108-10).

On habeas review, the question of whether prosecutorial misconduct violated a defendant's Fourteenth Amendment right to due process is governed by the Supreme Court's decision in Darden v. Wainwright, 477 U.S. 168 (1986).  The issue is "whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Id. at 181.  The "quantum or weight of the evidence is crucial to determine whether the prosecutor's statements before the jury were so prejudicial as to result in a denial of due process.  Id."  Although "an invited response" during closing arguments does not excuse improper comments, it is used to determine the effect on the trial as a whole.  Id. at 182.

On remand, the trial judge opined that defense counsel's attack on police tactics "really invited a lot of comment back about the police work that was done."  (State's Mem. at 42)(citing ECF No. 15-7 at 46-47.) The appellate court concluded any overreaching by the prosecutor in defending police conduct "could not have affected the result."  Massey, 2010 WL 3419186, at *11.  This Court agrees.  Even if the prosecutor was wrong to suggest the defense was cynical or that it tried to distract the

jury from reviewing the evidence, it is very unlikely the jury was influenced by this suggestion.

The jury heard from both sides regarding the nature of the police conduct during investigation, and could make their own inferences from the facts, and the opposing arguments offered in closing statements.  As to the effect on the verdict, the trial was lengthy and the jurors were unlikely to have discarded their impressions from the presentation of evidence in favor of a suggestion by the prosecutor regarding the defense tactics. There was strong evidence against Petitioner.  Again, the evidence included an eyewitness identification with corroborating testimony, Petitioner's flight from the state, and Petitioner's cellmate testifying that Petition had confessed. On the other hand, evidence supporting Petitioner's theory that Gary Way hid an AK-47 in his baggy clothing and that he was the shooter was weak in comparison.  Considering the weight of the evidence, it is highly unlikely the prosecutor's statements were so prejudicial as to result in a denial of due process. Therefore, the state court's decision was not an unreasonable application of the test announced by the Supreme Court in Darden.  The Court will deny Ground Four of the petition.

III.  <u>CONCLUSION</u>

For the reasons set forth above, the Petition under 28 U.S.C. § 2254 [Doc. No. 26] will be denied on the merits.  An appropriate order follows.

IV.  <u>CERTIFICATE OF APPEALABILITY</u>

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter.  <u>See</u> Third Circuit Local Appellate Rule 22.2.  The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The discussion of Petitioner's claims above demonstrates that Petitioner has not made such a showing, and this Court will not issue a certification of appealability.


<u>s/Renée Marie Bumb</u>
**RENÉE MARIE BUMB**
**United States District Judge**


Dated: <u>March 23, 2015</u>